UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KENDRICK D. EATON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 1:21-CV-00010-HAB |
| ) | |
| INTERNATIONAL PAPER COMPANY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

After he was suspended, and later terminated, from his position at Defendant, International Paper Company (IPC), Plaintiff Kendrick D. Eaton (Eaton) filed suit asserting race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* and 42 U.S.C. §1981.[1] Before the Court is IPC's Motion for Summary Judgment (ECF No. 20). The parties have fully briefed the motion (ECF Nos. 21, 27, 32), making the matter ripe for decision. Because the Plaintiff's evidence fails to raise an inference of race discrimination, IPC's Motion for Summary Judgment will be GRANTED.

**FACTUAL BACKGROUND**

IPC is a manufacturer of containerboard and corrugated packaging products, uncoated freesheet papers, and cellulose fiber products at its various facilities. (Sherri Roberts (Roberts) Decl., ECF No. 22-1, ¶2). IPC employs First Operators, Second Operators, Helpers, Miscellaneous, and T-Cart employees at the Fort Wayne facility. (*Id.* ¶3). At all relevant times,

---

[1] Eaton originally asserted three claims against IPC: race discrimination based on his suspension and termination, failure to promote and retaliation. In his response brief, Plaintiff withdrew his claims for failure to promote and retaliation. Summary judgment therefore is GRANTED to IPC on these claims.

Roberts served as the Regional HR Manager for IPC with responsibility for the IPC facility in Fort Wayne, Indiana. (*Id.* ¶1).

IPC hired Eaton, an African American, in 2014 as a "Helper." (Kendrick Eaton Dep., ECF No. 22-2, at 15)[2]. He later transferred to the "Miscellaneous" position where he remained for the rest of his employment with IPC. (*Id.* at 16-19).[3] IPC suspended Eaton on October 2, 2019, "for repeatedly refusing to sign training documents." (Roberts Decl. ¶22). He was terminated on October 14, 2019.

IPC has a uniformly applied policy requiring employees to sign attendance sheets following training sessions to document their attendance. (Roberts Decl., ¶15). On September 30, 2019, Eaton attended a training session he characterized as how to "make a box." (Eaton Dep. at 85). After the training, he received a training document with a heading that read "Training Topic: make a box" that he was asked to sign. (*Id.* at 84).

Roberts claims that the document is not intended to show an employee's understanding of the training, but simply to show that the employee attended and received the training. (*Id.* ¶18).[4] Yet the sign in sheet for the "make a box" training creates a different impression; it contains this language above the employee's signature line: "I have completed the training *and understand its contents…*" (ECF No. 22-3 at 2) (emphasis added). The document also contains a section that reads

---

[2] References to Eaton's Deposition reflect the page number of the deposition transcript, not the ECF page number.

[3] Throughout his employment with IPC, Eaton applied for various supervisory positions. He was not selected for any of the positions because other candidates were considered more qualified by IPC. (Roberts Decl., ¶¶'s 5-6; 10, 12).

[4] Roberts elaborates that for administrative purposes, such as when the Occupational Safety and Health Administration (OSHA) requests it, IPC keeps training paperwork on file. (Roberts Decl. ¶17).

2

"Main points Covered (Primary Instruction(s) the trainee *must understand*)." (*Id.*) (emphasis added). For ease of understanding, a snippet of the training document is below.

| Training Topic: | make a box |
|---|---|
| Trainer: | James Bradford |
| Training Material: | Attached |
| Date: 9/30/2019 | Duration: 15 min |
| Training Location: | Converting Area |

| Main Points Covered (Primary instruction(s) the trainee must understand): | |
|---|---|
| 1 | Print quality |
| 2 | ~~collapse on top flap~~ |
| 3 | |

I have completed the training and understand its contents:

(ECF No. 22-3). It is undisputed that Eaton did not sign this training document. The disputed fact is whether he *refused* to sign the training document.

Eaton acknowledged that he signed some documents but regularly did not sign training documents. (Eaton Dep. at 66-67, 69).[5] He testified that he did not sign documents that he did not understand or that did not pertain to his position:

> Q: And what documents did you not sign?
> A: The ones that I – I didn't understand.
> Q: Can you give me some examples.
> A: Machine operating. Machine operating documents. I didn't understand them.
> Q: And why not?
> A: Because it was more maintenance oriented.
> Q: And when you say a machine operating document, what are you referring to?
> A: The machine operating positions, they was explaining – explaining mechanical uses of the machine.
> Q: And these were documents for the machine operator, you're saying?

---

[5] IPC does not require employees to sign disciplinary documents and permits supervisors to write "refused to sign" on the signature line. IPC does not make a similar exception for training documents. (Roberts Decl. ¶¶ 20-21).

>     A:   Yes.
>     …
>     Q:   Okay were you told you had to sign that document?
>     A:   No.

(Eaton Dep. at 66-67, 69). Despite Roberts assertions that the training document policy was a uniformly applied policy, Eaton is adamant that he was never told that he needed to sign any training document prior to the "make a box" training. (Eaton Dep. at 66-67, 70, 71). Rather, he states a paper was passed around at the other training meetings to sign but he was never instructed that he must sign them. (*Id.* at 67, 70).

That all ended when it came to IPC's attention after the September 30 training that Eaton was not signing training documents.[6] On October 1, 2019, James Bradford (Bradford), a supervisor and the trainer for the "make a box" training, approached Eaton during his shift and instructed Eaton that he should be signing such documents. (Eaton Dep. at 70-71: "He told me I need to sign documents, period."). Eaton admits that Bradford instructed Eaton to sign the "make a box" training document. (Eaton Dep. at 72).

Bradford then told Eaton to meet with Kyle Bowman (Bowman), the Production Supervisor. (Aff. of Kendrick Eaton, ECF No. 28-1, ¶ 9). According to Eaton he is a non-union employee. But he went to Bowman's office with a union representative (Mark) and two other employees as "witnesses." (*Id.*).[7] Mark went into Bowman's office and returned a few minutes later, telling Eaton, "[you do not] have to sign shit." (*Id.* ¶ 9(c)). After that, Eaton was advised the meeting was cancelled. (*Id.* ¶9(b)).

---

[6] Eaton believes the union and Kyle Bowman had a meeting and during that meeting there was a discussion about Eaton not signing documents.

[7] Eaton is a non-union employee. There is no explanation for why Eaton took a union representative with him to the meeting with Bowman.

On October 2, 2019, Bowman asked to meet with Eaton again. (Eaton Aff. ¶ 9(d)). Eaton went to his office and spoke with Bowman. The meeting did not last long. Eaton asked if he could bring other individuals as witnesses, but Bowman said no. Eaton then asked if he could retrieve his notebook from his car. Bowman told Eaton if he left he would be considered to have abandoned his employment. Before Eaton could respond Bowman suspended him. (*Id.* ¶ 9(d)).[8]

Eaton's account of why he did not want to sign the form is a bit of a mess and frankly, the Court cannot discern from the partial deposition record submitted, and the lack of any evidence from Bradford or Bowman, exactly what occurred or with whom he had discussions. Piecing it together as best the Court can, Eaton testified as follows about why he did not want to sign the form:

> The last meeting I had had, it was a – it was a meeting containing some boxes with operating, and the document at that time had a cell phone on it. And at that time, it was some stuff on there. I just didn't understand it. And I requested give me time to read over it, give me time to ask questions. So I just asked a question. I didn't refuse to it at that particular time.

(Eaton Dep. at 70).[9] Later, Eaton explained that there were "a couple of issues" with the form, but the next page of his deposition is omitted from the record. (Eaton Dep. at 86, stating that there were a couple of issues). Eaton's deposition suggests that he had the above interaction with Bradford; but his later-filed affidavit states that he "merely asked a question to Kyle Bowman, and as a result I got suspended." (Eaton Aff. ¶9). Later in his deposition, Eaton is asked whether both Bowman and Bradford told him *at the October 1 meeting* that he needed to sign the training

---

[8] There is no testamentary or documentary evidence in the record from Bowman or Bradford about these events. Eaton claims he was suspended for insubordination but Roberts Declaration states it was for failing to sign the training documents.

[9] Eaton's testimony that he had a question about why the form had something about cell phones on it is borne out in the record. In the form provided to the Court the "Main Points Covered" section contained two items: print quality, and a second item that appears to have the words "cell phone" marked out. The Court assumes that this is what Eaton references when he talks about a "cell phone" being on the document.

5

document and Eaton responded, "yes." (Eaton Dep. at 99). But the Court cannot discern whether Eaton ever engaged in an October 1 meeting with Bowman *and* Bradford, since Eaton's affidavit states that he was told by Mark that the October 1 meeting was canceled. (Eaton Aff. ¶ 9(b)). In any case, what is consistent is Eaton's insistence that he never refused to sign the document and he was not asked to sign it after Bowman suspended him. (Eaton Dep. at 70; Eaton Aff. ¶ 9(c): "I never refused to sign the document and was not asked to sign the document after Mark exited Kyle Bowman's office and said that I did not have to sign it.").

That said, while he was on suspension, Bowman tried to contact Eaton to no avail. Eaton claims that he called Bowman on October 7 to see if a "return to work" meeting had been scheduled, but Eaton did not reach him. On October 8, 2019, Bowman sent Eaton a letter by certified mail:

> We have attempted to contact you by phone on 10/4/10 and 10/7/19. You have not returned either call. Please contact me immediately at 260-478-2844 regarding your employment. If we do not hear from you by noon on 10/11/19, we will consider you as having resigned your employment at International Paper.

(ECF No. 22-4). Eaton responded to Bowman's letter, writing: "I'm not resigning my employment at International Papers Fort Wayne, Indiana. Please send the results of your investigation to the address on file." (ECF No. 22-5). On October 14, 2019, IPC terminated Eaton's employment. According to Roberts, had Eaton signed the training document at any point during his suspension, he would have been reinstated with a "final warning." (Roberts Decl. ¶ 23).

Eaton suggests that other white employees either refused to sign documents or engaged in insubordination, but IPC did not fire them. He mentions Kevin Witner (Witner) in both his affidavit and during his deposition. Eaton claims that Witner was "deliberately insubordinate to management" throughout his employment and about a month before Eaton was terminated, Witner "exclaimed" to people in the breakroom that "management had wanted him to sign documents and

6

he refused to sign them and nothing happened to him." (Eaton Aff. ¶10). But Eaton had no knowledge what documents Witner refused to sign; he assumed it was a training document. (Eaton Dep. at 77 – answering "no" when asked if he knew what kind of document Witner refused to sign).

Next Eaton dials up Josh Howard (Howard), a first shift operator with IPC, and Chaney Kelley (Kelley), both white union employees. Not much is said about Kelley other than he has been insubordinate and worked the same shift as Eaton. Eaton describes Howard as "very insubordinate." (Eaton Dep. at 79). He elaborates in his affidavit that "on September 19, 2019 Josh got mad and cussed out management stating that he was not 'doing shit'." (Eaton Aff. ¶11). According to Eaton, Howard left the property and did not get written up for insubordination or job abandonment. (*Id.*). Eaton did not observe these events; he testified he knew the incident occurred because of factory floor scuttlebutt. (Eaton Dep. at 80). Eaton also acknowledges that Howard worked a different shift and had a different supervisor than Eaton did.

For its part, IPC states that it is unaware of any training documents that Witner, Howard, or Kelly failed to sign. (Roberts Decl. ¶24).

Eaton filed a charge of discrimination on October 16, 2019, and amended that charge on October 23. In both charges, Eaton asserts that the above facts establish that IPC discriminated against him based on race.

## DISCUSSION

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its

7

motion and identifying those portions of designated evidence that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

**B. Analysis**

Eaton asserts race discrimination claims under both Title VII and 42 U.S.C. §1981. When considering summary judgment on a race discrimination claim under Title VII and § 1981, the "singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020); *see also Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d

887, 892 n.1 (7th Cir. 2018) ("We generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981."). To answer that question, the Court looks at the evidence holistically. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) ("[A]ll evidence belongs in a single pile and must be evaluated as a whole.").

Employing the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is one way that a plaintiff can help the court sift through the evidence to assess whether discrimination is established. Under that approach, the plaintiff must first produce evidence establishing a four-part prima facie case: (1) he is a member of a protected class; (2) he was performing at a level that met his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) he was treated differently than a similarly situated person outside the protected class. *Igasaki,* 988 F.3d at 957. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If the employer supplies a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to produce evidence that the defendant's reason is pretext for discrimination. *Id*. In this context, pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). But "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013).

Eaton has not produced any direct evidence of discrimination, so the Court analyzes his claim under the indirect approach. The parties' dispute the second and fourth elements of the prima facie case; but the Court focuses solely on the fourth element, whether similarly situated white employees received more favorable treatment than Eaton, as it is determinative here.

9

The similarly situated inquiry is flexible, common-sense, and factual. It asks "essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). There must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id*. In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, considering all the circumstances, that an impermissible animus motivated the employer's decision. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7thCir. 2012).

Eaton concedes in his brief that the comparable employees he has mentioned "are not *exactly* comparable" but claims they are "comparable enough." (ECF No. 27 at 7). He contends, for instance, that all three of his comparators were insubordinate, but not terminated. This could very well be a truthful statement, but it isn't helpful because, aside from his own say-so and speculation, the Court has nothing in the record from which to draw the required inferences. *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) ("[G]uesswork and speculation [is] not enough to avoid summary judgment.").

Eaton need not find an employee that is an exact replica; indeed, the "[c]ourts] are looking for comparators, not 'clone[s]'" *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). But the evidence here is simply lacking. "The objective is to eliminate other possible explanatory variables such as differing roles, performance histories, or decision-making personnel, in order to isolate the critical independent variable of discriminatory animus." *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 549 (7th Cir. 2017). The record is too under-developed to permit a

reasonable factfinder to conclude that Eaton was similarly situated to any of his alleged comparators.

Eaton relies on examples of insubordinate conduct of Witner and Howard, some of which he personally observed and some in the form of hearsay or random statements made in his presence. But the factual evidence ends there. Eaton did not provide the timing or context evidence that would assist a factfinder in making the similarly situated assessment. There is no evidence of the comparator's insubordination (or that it actually occurred), whether if it did occur it would be of comparable seriousness to Eaton's conduct, whether any discipline was imposed or documented, whether the decision-makers were the same, or any other pertinent factual information that would permit the factfinder to draw the required inference that Eaton was treated differently because of his race. "At summary judgment, ... saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact." *United States v. 5443 Suffield Terrace, Skokie*, 607 F.3d 504, 510 (7thCir. 2010). Based on the record here, Eaton has not produced evidence supporting an inference that similarly situated non-black employees received better treatment than he did. And, for that reason, he cannot proceed to trial on his race discrimination claims. *See Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1142 (7thCir. 1998) ("Fisher fails to raise a genuine issue of material fact that he could satisfy the prima facie case requirement that a similarly situated employee received more favorable treatment.... This court need not proceed any further in the *McDonnell Douglas* analysis once we determine that a claimant has failed to make a prima facie case." (citations omitted)). IPC's motion for summary judgment is GRANTED.

## CONCLUSION

Based on the reasoning above, IPC's Motion for Summary Judgment (ECF No. 20) is GRANTED in all respects. The Clerk is directed to enter judgment in IPC's favor.

SO ORDERED on November 2, 2022.

                                              s/ *Holly A. Brady*
                                              JUDGE HOLLY A. BRADY
                                              UNITED STATES DISTRICT COURT